UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CAUSE NUMBER 3:97-CR-26(2) RLM |
| | ) | |
| JOHN JOSE WATFORD | ) | |

<u>OPINION AND ORDER DENYING COMPASSIONATE RELEASE</u>

This is John Watford's second motion for compassionate release. The court denied his first, understanding that it sought benefit of the First Step Act's retroactivity provisions. [Doc. No. 295]. This motion seeks release under the First Step Act's provision that an inmate, not just the Bureau of Prisons, can seek compassionate release. To win compassionate release, an inmate must first show that (1) he has exhausted his administrative options within the Bureau of Prisons, and (2) extraordinary and compelling reasons support compassionate release. If he makes such a showing, the court has discretion, after considering the statutory sentencing factors in 18 U.S.C. § 3553(a), to order the inmate's release.

Mr. Watford contends that the sheer unreasonableness of his sentence (when evaluated by modern standards) amounts to a sufficient extraordinary and compelling reason. This court reads the statute differently. The bulk of Mr. Watford's sentence (45 years) consists of sentences under 18 U.S.C. § 924(c) that were "stacked," meaning each the sentence on one count lengthened the sentences on the others. While the First Step Act clarified the proper way of dealing with multiple counts of conviction under § 924(c), section 403(b) of the Act specified

that the clarification didn't apply retroactively to defendants like Mr. Watford. As this court reads the First Step Act, a court can't effectively convert the non-retroactivity provision into an extraordinary ground for compassionate release, even if yesterday's way of applying § 924(c) produced a manifestly unreasonable sentence by today's standards. Mr. Watford also cited his health and the COVID-19 pandemic as grounds for compassionate release, but he doesn't have any conditions that place him at greater risk than other inmates.

Our court of appeals hasn't decided whether a sentence's unreasonableness can alone amount to grounds for compassionate release, and might disagree with this reading of the First Step Act; some other circuit courts read the law as Mr. Watford does. Given that possibility, this opinion goes on to evaluate the statutory sentencing factors, and to conclude that while Mr. Watford's 802-month sentence was mandatory at the time of sentencing, it is extraordinarily unreasonable today. This court would order compassionate release if it had jurisdiction to do so.

## I. FACTS

John Watford, now aged forty-eight, is serving an 802-month sentence at the Federal Correctional Institution in Memphis, Tennessee. He was convicted of three counts of aggravated bank robbery, which accounted for 262 months of his sentence, and three counts of carrying a firearm in furtherance of a crime of

violence under 18 U.S.C. § 924(c), which produced the remaining 540 months of his sentence.

A little before 11:00 a.m. on May 2, 1997, Mr. Watford and Ricky Anderson entered a Sobieski Federal Savings and Loan branch in South Bend. Mr. Watford went to the teller with a plastic grocery bag while Mr. Anderson waited at the door and ordered the tellers to put money (but no dye packs) in the bag. Mr. Anderson displayed the only handgun the tellers saw. The robbers fled with just under 7,000 federally insured dollars.

Mr. Watford and Mr. Anderson returned to the same Sobieski Federal branch two and a half weeks later. This time each had and displayed a handgun, and each approached the tellers, telling them to give them money with no dye packs. They took a little over $2,000.00.

They tried to rob the Elcose Federal Credit Union in Elkhart, Indiana, the next day. Mr. Anderson had a handgun. They left with nothing.

Mr. Watford and Mr. Anderson didn't limit their activity to the Northern District of Indiana. Two days before their first Sobieski robbery, they robbed an Indianapolis branch of the National Bank of Detroit. Mr. Anderson was armed, and they left with a little over $1,700.00. A week after the attempted Elcose robbery, they robbed the Star Financial Bank in Anderson and stole about $20,000. Both men might have been armed.

Mr. Watford has moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A). The government opposes his motion.

A court considering a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) must decide whether the movant has exhausted his remedies within the Bureau of Prisons, 18 U.S.C. § 3582(c)(1)(A), decide whether "extraordinary and compelling reasons" warrant the relief sought, 18 U.S.C. § 3582(c)(1)(A)(i), and consider the sentencing factors set forth in 18 U.S.C. § 3553(a)(1)(A)(iii). Until the Sentencing Commission updates the pertinent application notes to include prisoner-initiated applications, district judges must apply the statutory criteria of extraordinary and compelling reasons. United States v. Gunn, 980 F.3d 1178 (7th Cir. 2020).

## II. EXHAUSTION

A petitioner for compassionate release must first exhaust his remedies within the Bureau of Prisons. *See* United States v. Sanford, 2021 WL 236622 (7th Cir. Jan. 25, 2021). Mr. Watford made his compassionate release request to the warden of his institution on October 15, 2020, and the warden didn't respond within thirty days, so Mr. Watford has exhausted his administrative remedies for purposes of a motion for compassionate release.

4

### III. EXTRAORDINARY AND COMPELLING REASONS

*A. The Applicable Law*

Mr. Watford and the government disagree about what can or must be shown to satisfy the requirement of extraordinary and compelling reasons for compassionate release. Mr. Watford maintains that his 1998 sentence is unreasonable when seen through the lenses of 2021 sentencing law, and that the unreasonableness of his sentence can constitute an extraordinary and compelling reason for compassionate release. The government contends that the application notes to U.S.S.G. § 1B1.13 define extraordinary and compelling reasons. Neither side agrees with the other.

*1. The Government's Argument: Application Notes Are Limiting*

The government maintains its position, apparently to preserve the issue for appeal, that the application notes to U.S.S.G. § 1B1.13 contain the only permissible definition of extraordinary and compelling reasons. Section 3582(c) of Title 18 limits a court's power to modify a sentence to three situations:

- when the Sentencing Commission has reduced a sentencing range and made its amendment retroactive, 18 U.S.C. § 3582(c)(2);

- when allowed by a statute or Fed. R. Crim. P. 35, 18 U.S.C. § 3582(c)(1)(B); and

- when the court finds that extraordinary and compelling reasons warrant a reduction, "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . ." 18 U.S.C. § 3582(c)(1)(A).

The only policy statements addressing compassionate release are those accompanying U.S.S.G. § 1B.13, the government's argument goes, so a compassionate release order can issue only if it consistent with those policy statements.

The government cites several cases in which circuit and district courts agreed with that position, but district courts in this circuit must reject the government's position. In <u>United States v. Gunn</u>, 980 F.3d 1178 (7th Cir. 2020), our court of appeals recognized that while the Sentencing Commission has issued policy statements to address motions or determinations by the Director of the Bureau of Prisons, the First Step Act authorized—for the first time—prisoners to file compassionate release motions with the court. The policy statement in U.S.S.G § 1B1.13 is self-limiting because it begins with "Upon motion of the Director of the Bureau of Prisons . . . ." Having lacked a quorum for the last few years, the Sentencing Commission hasn't issued any policy statement to address the meaning of extraordinary and compelling when a prisoner makes the motion.

When dealing with an inmate-generated motion for compassionate release, district courts in this circuit "must operate under the statutory

6

criteria—extraordinary and compelling reasons—subject to deferential appellate review." <u>United States v. Gunn</u>, 980 F.3d at 1180.

The <u>Gunn</u> holding undercuts the value of the government's cited case law. For example, the Court of Appeals for the Tenth Circuit decided in <u>United States v. Saldana</u>, that the district court should have dismissed for want of jurisdiction a compassionate release petition based on rehabilitation and changes in sentencing law "[b]ecause Mr. Saldana is unable to show that he satisfied 'one of the specific categories authorized by section 3582(c) . . . .'" 807 Fed. Appx. 816, 820 (10th Cir. 2020) (quoting <u>United States v. Brown</u>, 556 F.3d 1108, 1113 (10th Circuit 2019)). The <u>Gunn</u> court held that other paths are available to a petitioner.

The district court's holding in <u>United States v. Dodd</u> flowed from its understanding that "[t]he Commission's policy statements . . . are binding concerning what should be considered extraordinary and compelling reasons for sentence reduction under 18 U.S.C. § 3582(c)(1)(A)." 471 F. Supp. 3d 750, 754 (E.D. Tex. 2020). <u>Gunn</u> holds otherwise. The holding in <u>United States v. Brown</u> was based on the district court's conclusion that, "The Court agrees with the reasoning of those courts that have found that applying the policy statement . . . to motions filed by defendants, just as it applies § 1B1.13 to motions filed by the BOP, is proper absent any authoritative indication to the contrary." 2020 WL 3511584 at *5 (E.D. Tenn. June 29, 2020). Again, <u>Gunn</u> requires a different approach.

The court agrees with Mr. Watford that the application note to U.S.S.G. § 1B1.13 doesn't provide the complete definition of extraordinary and compelling reasons as the First Step Act uses that phrase in 18 U.S.C. § 3582(c)(1)(A).

*2. Mr. Watford's Argument: Sentence Unreasonableness as Grounds for Release*

Mr. Watford argues, with the government disagreeing, that a sentence's unreasonableness can itself be an extraordinary and compelling reason for purposes of compassionate release. His argument about unreasonableness flows from § 403(b) of the First Step Act, which clarified the law.

When Mr. Watford was sentenced in 1998, a person's first conviction under § 924(c) required a sentence of at least five years, which had to be consecutive to any other sentence. That's true today, too. The minimum penalty increased from five years to twenty years (now twenty-five) for each subsequent offense. Mr. Watford was convicted of three separate armed robberies in the spring of 1997; each robbery count carried a § 924(c) count. In 1998, the law was understood to mean that a "second or subsequent offense" was one committed after the first. So the § 924(c) count relating to the first robbery for which Mr. Watford was convicted (the May 2, 1997, robbery of the Sobieski Savings and Loan) required at least a five-year sentence, which had to be served consecutively to all other sentences. The § 924(c) count on the second charged and convicted robbery (the May 19, 1997, robbery of the Sobieski Savings and Loan) amounted to the second offense,

requiring at least twenty more years to be added to the other sentences. And the § 924(c) count on the third charged attempted robbery (the May 20, 1997, robbery of the Elcose Federal Credit Union) amounted to a third offense, requiring still another twenty years (at least) to be added to the other sentences. *See* United States v. Bennett, 908 F.2d 189, 194 (7th Cir. 1990). So under the law as it was understood in 1998, the three convictions under § 924(c) added forty-five years to Mr. Watford's sentence,—two-thirds of Mr. Watford's sentence.

Section 403 of the First Step Act clarified Congressional intent. Congress said that by "subsequent offense," it meant offenses committed after another § 924(c) conviction. One court described the change as "an extraordinary development in American criminal jurisprudence. A modern-day dark ages—a period of prosecutorial 924(c) windfall courts themselves were powerless to prevent—had come to an end." United States v. Haynes, 456 F. Supp. 3d at 502. Congress specifically made its clarification non-retroactive, so § 403(b) of the First Step Act doesn't directly benefit Mr. Watford. Today's courts focus on the dates of the convictions and not the dates of the crimes. Had that been the law when Mr. Watford was sentenced in 1998, the court would have had to impose three five-year terms, consecutively to each other as well as to the bank robbery sentences—fifteen years instead of forty-five.

Mr. Watford contends that application of the pre-First Step Act understanding produced a sentence that is unreasonable today. That

9

unreasonableness, he contends, constitutes an extraordinary and compelling reason for compassionate release.

The Fourth Circuit Court of Appeals agrees with Mr. Watford. In <u>United States v. McCoy</u>, 981 F.3d 271 (4th Cir. 2020), the court upheld compassionate release orders from two district courts based exclusively on the unreasonableness (by contemporary standards) of the sentences and the circumstances surrounding those circumstances. Sentences under § 924(c) had greatly increased both of the sentences at issue. The court of appeals decided that since no policy statement limited the scope of possible reasons, "district courts are 'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (quoting <u>United States v. Zullo</u>, 976 F.3d 228, 230 (2nd Cir. 2020)).

Mr. Watford also cites <u>United States v. Haynes</u>, 456 F. Supp. 3d 496 (E.D.N.Y. 2020), which offers facts very similar to this case. Kevin Haynes was sentenced in 1994 to 558 months' imprisonment. The sentence included 480 months—forty years—on second and third § 924(c) counts that were added after Haynes rejected a plea offer (Mr. Watford's submission reports the same chronology, and assumes the same motivation, in his case). The government declined the district court's invitation to trigger a non-First Step Act process that would allow Mr. Haynes to be resentenced in accordance with the First Step Act's non-retroactive clarification that multiple § 924(c) counts in one indictment

weren't to be deemed "second or subsequent" for an offender who had never been convicted of the crime before. Anticipating the eventual reasoning of the Fourth Circuit in United States v. McCoy, the Haynes court decided that the unreasonableness of the original sentence is enough to constitute an extraordinary and compelling reason to grant compassionate release.

This court isn't persuaded that the approach taken in the McCoy and Haynes cases works in this circuit. Our court of appeals directed district courts to apply the extraordinary and compelling reasons test as statutory criteria. United States v. Gunn, 980 F.3d at 1180. With no Sentencing Commission policy statements to guide the district courts in deciding what amounts to an adequate reason in a case brought by an inmate, courts must consider the entire statute in defining extraordinary and compelling.

The First Step Act:

- gave prisoners the right to ask courts for compassionate release, and

- clarified that § 924(c) convictions weren't to be stacked as courts had been doing, but

- provided that the anti-stacking provision wouldn't be retroactive,

and so provided no basis for revisiting a sentence under 18 U.S.C. § 3582(c)(2) (providing that a sentence can be modified when the Sentencing Commission makes an amendment retroactive). Mr. Watford's reading of the First Step Act would dilute the meaning of the non-retroactivity provision in § 403(b) of the First

11

Step Act: it would make everything potentially retroactive at the sentencing court's discretion.

Further, it seems challenging to construct an explanation of how a sentence that complies with the First Step Act, but doesn't apply the anti-stacking provision retroactively, can be called extraordinary in any ordinary sense of the word. Many inmates have stacked § 924(c) sentences that were imposed before the First Step Act, and the non-retroactivity provision denies relief to all of them. And if Congress considered a sentence based on stacked § 924(c) counts to be a compelling reason for compassionate release, it's hard to imagine why it made § 403(b) non-retroactive.

This court respectfully disagrees with the McCoy and Haynes courts. It's too great a reach to hold that a sentence's unreasonableness amounts to an extraordinary and compelling reason for compassionate release if that unreasonableness flows entirely from stacked sentences under § 924(c).

Still, the reasonableness of a sentence might play a part in deciding a motion for compassionate release. Compassionate release requires findings of exhaustion and extraordinary or compelling reasons; without those findings, the court has no authority to order compassionate release. Findings of exhaustion and extraordinary or compelling reasons give a court discretion to order compassionate release, but the statute also requires the court to consider the consistency of

12

compassionate release with the sentencing factors in 18 U.S.C. § 3553(a); significant changes in sentencing law inevitably come into play at that point.

*B. Extraordinary and Compelling Reasons: Mr. Watford's Risks of COVID-19*

Nothing in the First Step Act limits a compassionate release motion to circumstances relating to COVID-19, but the risk of COVID-19 is the only factor other than his sentence's unreasonableness to which Mr. Watford points. Mr. Watford's submission doesn't show that he faces greater risks from COVID-19 that most other inmates do.

The Bureau of Prisons has undertaken impressive efforts to keep inmates and staff safe from the coronavirus despite the inability of any prison to impose social distancing or alcohol-based hand sanitizer recommendations. The Bureau of Prisons' efforts have been more successful in some institutions than in others, but the recent national surge in cases hit federal penal institutions particularly hard. According to statistics posted by the Bureau of Prisons, 897 inmates at FCI Memphis have been tested for COVID-19, with 384, or 43 percent, testing positive.[1] FCI Memphis's reported population is 1,027.[2] Miami-Dade County,

---

[1] https://www.bop.gov/coronavirus/index.jsp (last accessed February 11, 2021).

[2] https://www.bop.gov/locations/institutions/mem/index.jsp (last accessed February 9, 2021).

Florida, where Mr. Watford proposes to live with his mother, recently reported that well under 10 percent of people tested are showing positive for COVID-19.[3]

Mr. Watford points to his history of asthma, his obesity, and medical emergencies he suffered in December 2018 and August 2020.

The Centers for Disease Control have posted lists of conditions that can increase a person's risk of severe illness or death from COVID-19.[4] Because our understanding of COVID-19 is incomplete, the CDC has one list of conditions known to increase the risk of severe illness from COVID-19 and another list of conditions that might place a person at increased risk before severe illness.

Mr. Watford has a body mass index of 35. Depending on its severity, the CDC lists obesity as a factor that is known to, or might, increase a person's risk from COVID-19. But obesity doesn't much set Mr. Watford apart from the rest of the nation's prisoners: almost three quarters of federal and state prison inmates are overweight, obese, or morbidly obese.[5]

Mr. Watford went to the medical staff at the United States Prison in McCreary, Kentucky on December 4, 2018, when he was light headed, dizzy, and

---

[3] https://covidactnow.org/us/florida-fl/county/miami_dade_county/?s=1592532 (last accessed February 11, 2021).

[4] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed February 8, 2021).

[5] https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf (last visited February 3, 2021).

visibly sweating. The medical personnel told Mr. Watford "he had [no] objective data pointing to any major issues but if symptoms persist he could sign up for sick call." [Doc. No. 306-1, at 49]. Mr. Watford retuned to the medical personnel eight days later with breathing issues and a racing heart beat. The medical personnel determined he was suffering from tachycardia and asthma; they told him to rest and use his inhaler as needed.

Mr. Watford returned to the medical personnel two days later with breathing and heart problems. The medical staff thought he might be suffering a heart attack, and sent him to an off-site hospital, Lake Cumberland Regional Hospital in Somerset, Kentucky, which in turn sent him by helicopter to the University of Tennessee Medical Center for more specialized care. Doctors found he was suffering from a bilateral saddle embolism with right-side heart strain visible on an ultrasound. Mr. Watford was placed in intensive care. Medical records reflect that he was coughing up blood. Doctors performed an embolectomy, removing an embolism from Mr. Watford's lung. Ever since, Mr. Watford has been prescribed a medicine called Apixaxban used to prevent blood clots arising from atrial fibrillation, and he still takes that medicine. The medical records seem to indicate that Mr. Watford's breathing problems stemmed from the embolism, rather than from his asthma.

Mr. Watford was diagnosed with another pulmonary embolism in March 2020. Anticoagulation therapy was prescribed and continues, with Mr. Watford

15

having reported mild occasional symptoms. BOP medical staff saw Mr. Watford last August for swollen knees, shortness of breath, heavy sweating, blood clots and elevated blood pressure.

The CDC lists moderate to severe asthma as a condition that might increase a person's risk from COVID-19. The government notes that the American Association of Retired Persons has published an article ("COVID-19 Risks to People With Asthma Much Lower Than Expected"), but that article hasn't led the CDC to remove asthma from its list. Mr. Watford's medical records don't appear to show an ongoing problem with asthma. It appears that Mr. Watford was diagnosed with asthma many years ago, and the medical records contain several references to Mr. Watford's use of an inhaler. But while Mr. Watford was told to continue using the inhaler after the embolectomy soon to be discussed, nothing in the medical records connects his asthma to the embolism.

Mr. Watford suffered another incident in December, 2020, in which he was found semi-responsive in his cell and taken to an emergency room. He recovered with a dose of Narcan, and the doctors diagnosed a drug overdose. The records don't identify the drug that caused Mr. Watford's problem that night. The medical records stop there, so the court can't know if his prescriptions have been changed.

In sum:

•    Mr. Watford faces an elevated risk of COVID-19 because he is in prison, but that's true of every federal inmate;

16

- Mr. Watford is obese, and the CDC recognizes obesity as a condition that does or might increase one's risk from COVID-19, but that's true of around 75 percent of inmates;

- Mr. Watford suffers from asthma, which the CDC lists as a factor that might increase the risk from COVID-19, but this record doesn't allow a finding of its severity or even whether it has caused Mr. Watford a problem in recent years; and

- Mr. Watford has suffered from embolisms and tachycardia, which are matters of concern because the CDC list suggests anything affecting the heart or lungs might be a matter of concern, but the CDC doesn't specifically identify either as a factor the might increase the risk from COVID-19.

Mr. Watford hasn't shown an extraordinary and compelling reason for compassionate release. As the court reads the First Step Act, a court has no power to order any federal inmate released without an extraordinary and compelling reason. So the court must deny Mr. Watford's motion. But because reasonable minds can, and have, differed on this issue, the court will also discuss the factors that would affect the decision whether to exercise discretion—if the court had any—to grant compassionate release to Mr. Watford.

## IV. DISCRETION: SENTENCING FACTORS

A grant of compassionate release would effectively convert Mr. Watford's 802-month sentence to one of time served, or about twenty-three-and-a-half years of actual time served. Such a sentence would be consistent with sentencing law as it is understood today.

### A. Changes in the Law

Federal sentencing laws have changed, or are understood differently, in several ways that would produce a radically different sentence for Mr. Watford and his crimes today. The First Step Act's changes to § 924(c), discussed in Part II-A-2 of this opinion, are the most significant to Mr. Watford's sentence, but there have been others, as well.

- Mr. Watford was sentenced before the United States Supreme Court decided that the sentencing guidelines were advisory rather than mandatory. United States v. Booker, 543 U.S. 220, 258-266 (2005). When Mr. Watford was sentenced, the court had to choose a sentence within the guideline range unless something unique to the case took the case out of the "heartland" of cases of its sort. *See, e.g.*, United States v. Jones, 278 F.3d 711, 716 (7th Cir. 2002) ("After choosing the applicable sentencing range, the district court could apply an upward departure if it found that Jones' behavior was outside of the

18

'heartland' of conduct embodied by Guideline § 2J1.5."). So Mr. Watford didn't ask for, and the court didn't consider, a sentence below the guideline range. The court imposed the most lenient sentence it was authorized to give.

The guidelines are no longer binding on a sentencing court. The guidelines are understood to be advisory: today's sentencing courts seek a sentence that is reasonable within the meaning of 18 U.S.C. § 3553(a), looking first within the range the Sentencing Guidelines recommended, but are free to look outside the advisory range, as well. *See* United States v. Carter, 961 F.3d 953, 955 (7th Cir. 2020) ("The Sentencing Guidelines are no longer binding, but the correct calculation of a defendant's guideline range is 'the starting point and the initial benchmark' for federal sentencing.'").

- When Mr. Watford was sentenced in 1998, the law was understood to mean that, when deciding the sentence for the underlying felony (the crime in furtherance of which the firearm was used or carried), the sentencing court had to ignore the impending overlay of five (or forty-five) more years under § 924(c). So even had this court been free to look outside the guideline range for a reasonable sentence, the court couldn't have judged "reasonableness" with an eye toward the forty-five years that had to be added because of the stacked § 924(c)

19

counts. *See* United States v. Ikegwuoni, 826 F.3d 408, 410 (7th Cir. 2016) (citing United States v. Roberson, 474 F.3d 432, 436 (7th Cir. 2007)).

The Supreme Court rejected that doctrine in Dean v. United States, 137 S.Ct. 1170, 1176-1177 (2017) ("Nothing in § 924(c) restricts the authority conferred on sentencing courts by § 3553(a) and the related provisions to consider a sentence imposed under § 924(c) when calculating a just sentence for the predicate count."). That holding, like the First Step Act's anti-stacking provision, isn't retroactive, Worman v. Entzel, 953 F.3d 1004 (7th Cir. 2020), so it doesn't offer any direct help to Mr. Watford. But Dean would apply to a defendant being sentenced today.

• The firearm penalty would have only been one non-guideline factor a sentencing court would address today. In 1998, once it was established that the guidelines required a sentence of 802 to 867 months and that there were no grounds for a downward departure, a sentencing judge disinclined to impose a sentence longer than 802 months didn't need to discuss statutory sentencing factors commonly discussed today. Those factor include the nature and circumstances of the crimes, the defendant's history and characteristics, the need for the sentence to reflect the seriousness of the crime, protect the

public from the defendant, promote respect for the law, and deter the defendant and others from committing such crimes. 18 U.S.C. §3553(a). Today, any or all of those factors could warrant a sentence below or far below (or above) the advisory guideline range.

• Finally, when Mr. Watford was sentenced in 1998, his base offense catapulted from 25 to 34 because he had two prior felony convictions for what were at the time crimes of violence that qualified him for treatment as a career offender: Mr. Watford was convicted of burglary of a dwelling in Florida in 1990 and aggravated assault in Pennsylvania in 1995. Mr. Watford wouldn't be a career offender under today's version of the sentencing guidelines. In 2016, Amendment 798 to the guidelines removed "residential burglary" from the list of specific crimes that constitute crimes of violence under U.S.S.G. § 4B1.2.

A career offender's criminal history is VI, regardless of his actual past. U.S.S.G. § 4B1.1(b). At the 1998 sentencing, the court said that if Mr. Watford weren't a career offender, he would have been in criminal history category VI on the strength of his earned criminal history points. [Doc. No. 99 at 4 n.2]. That wouldn't be true today. In 1998, two criminal history points were assessed because a probation violation warrant was outstanding while he was robbing the banks,

and another point was assessed because he robbed the banks less than two years after his aggravated assault conviction. The guidelines don't assess criminal history points for those factors today. Under today's sentencing laws, Mr. Watford would be assigned to criminal history category V.

### B. Today's Sentencing Guidelines

Today's search for a reasonable sentence would begin with the Sentencing Guidelines. Gall v. United States, 552 U.S. 38, 49 (2007). The jury found Mr. Watford guilty of two counts of aggravated bank robbery, one count of attempted aggravated bank robbery, and three corresponding § 924(c) counts of using or carrying a firearm in furtherance of crimes of violence. The three robbery counts would be "grouped" and treated as a single offense for guideline purposes because they involved transactions connected by a common criminal objective. U.S.S.G. § 3D1.2(b). The base offense level for each of the robbery counts is 20. U.S.S.G. § 2B3.1(a). Each offense level would be increased by two levels because Mr. Watford and his confederate took or tried to take money from a financial institution. The offense levels wouldn't be enhanced for firearm involvement because of the firearms because of the separate § 924(c) firearms offenses, so the base offense level for each robbery offense would be 22. Each robbery would be a

"unit" for guideline purposes; with three units, Mr. Watford's offense level would be increased by three levels, to level 25.

At criminal history category V and offense level 25, the guidelines would recommend a sentencing range of 110 to 137 months for Mr. Watford on the robbery counts.

That leaves the § 924(c) counts. Without the stacking used in 1998, each count would carry a mandatory minimum sentence of five years consecutive to all other sentences, for a total of fifteen years in addition to whatever sentences were imposed on the robbery counts. The government argues that a firearm was brandished in each robbery, not simply possessed, so the government could have charged Mr. Watford with three counts of brandishing under § 924(c), with each such count punishable by a mandatory minimum consecutive sentence of seven years, for a total of twenty-one years. Maybe so, but Mr. Watford himself only had a gun during the second robbery. A jury properly instructed on accessory law might be willing to find Mr. Watford "used" the firearms his confederate possessed, but that he didn't "brandish" what he possessed only constructively. We can't know. In any event, the record now before the court includes only convictions for carrying, not brandishing.

With fifteen years, or 180 months, added to the 110 to 137 month advisory range for the robberies, the guidelines would recommend an aggregate sentencing range of 290 to 317 months. In 1998, Mr. Watford faced a sentence of 802 to 867

23

months. Today's advisory range would be about forty-four years shorter than what Mr. Watford faced in 1998.

### C. The Statutory Sentencing Factors

A sentencing court in 2021 would turn from the guideline calculation to the sentencing factors in 18 U.S.C. § 3553(c), which this court would also have to consider in deciding whether to grant compassionate release.

#### 1. Nature and Circumstances of the Offenses, § 3553(a)(1)

The facts of Mr. Watford's crimes are recounted in Part I of this opinion. About the only mitigating aspect of the crimes' nature and circumstances is that Mr. Watford and Mr. Anderson didn't steal as much money in the Northern District of Indiana as some bank robbers do.

Mr. Watford and Mr. Anderson took a little under $9,000 in the two completed charged robberies. Nobody was injured, no shots were fired. Mr. Watford didn't accept any responsibility in 1998. He denied everything and was convicted at a trial in which the prosecutor, among other things, demonstrated that the robber in each charged robbery wore the same very distinctive athletic shoes that were identical to what Mr. Watford wore to trial one day. As part of his compassionate release submissions in 2020 and 2021, Mr. Watford convincingly expressed remorse for his actions.

### 2. The Defendant's History and Characteristics, § 3553(a)(1)

Mr. Watford was twenty-five years old when he was sentenced. He had two children, aged five and two. Mr. Watford quit school in the eleventh grade and hadn't had a job in three years. He told the probation officer that he used cocaine and marijuana every day; he appears to have been ordered to treatment in another case but never showed up. In his recent filings, Mr. Watford says he was an addict in 1997 and the robberies were to let him buy drugs.

### 3. Need to Deter Criminal Conduct by Defendant and Others, § 3553(a)(2)(B)

Armed robbery is a very serious crime that calls for serious penalties to deter the robber and other potential robbers. This factor supported a significant sentence in 1998 and still does. Mr. Watford has been imprisoned for these crimes for nearly half his life. Judicial experience produces little expertise on what's needed to deter people, so the Sentencing Commission's expertise, demonstrated through the advisory range, ordinarily is the only indication a judge has of how great or small a sentence will deter. In 1998, the guidelines required an aggregate sentence of 835 months give or take about three years; today they recommend a range with a mid-point of 304 months, give or take fifteen months.

*4. Public Protection from the Defendant, § 3553(a)(2)(C)*

Mr. Watford was a dangerous young man in 1998. He was a thief and a burglar as a juvenile, with adjudications for shoplifting, grand theft (twice), and burglary. He continued his career as a burglar and a thief after turning eighteen, with adult convictions for burglary of a dwelling, burglary of a structure (the structure was a house), grand theft, motor vehicle theft, and criminal conversion. He also expanded into violence, with convictions for aggravated assault and misdemeanor battery. After five adult felony convictions, Mr. Watford moved into armed robberies with Mr. Anderson, committing the three charged, and two uncharged, robberies in Indiana in a one-month period from the end of April to the end of May 1998. The protection of the public demanded that Mr. Watford be isolated for a long time.

It's now a long time later, and if allowed to consider compassionate release, the court would have to evaluate the risk Mr. Watford poses to the public today. Mr. Watford argues that he poses a much lower risk today than he seemed to in 1998 because he was only twenty-five (he started his bank robbery spree on the day after he turned twenty-five) and, based on twenty-first century studies, his brain wasn't fully developed. The studies that Mr. Watford cites provide virtually no support for the proposition that the average male brain is still developing abilities such as risk evaluation, decision making, and judgment at or after age

twenty-five.[6] Each brain is different, but the studies that have found their way into the first page or two of Google indicate that the average male human brain is fully developed for these purposes by the age of twenty-five, though probably not much before.[7] The court can't confidently find mitigation in Mr. Watford's age at the time of these crimes.

At age forty-eight today, Mr. Watford might be thought to be reaching the time in life in which people age out of criminal activity, but the government cites persuasive studies for the proposition that offenders who have committed gun-related crimes engage in serious conduct and recidivate far more deeply into life than other offenders.[8] The passage of time might affect the need to protect the public, but Mr. Watford's age—either now or when he was robbing banks—doesn't.

---

[6] See James C. Howell et al., Bulletin 5: Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know 17 (2013), https://www.ncjrs.gov/pdffiles1/nij/grants/242935.pdf; MacArthur Found. Rsch. Network on L. and Neuroscience, How Should Justice Policy Treat Young Offenders?, 2 Law and Neuro (Feb, 2017), http://www.lawneuro.ord/adol_dev_brief.pdf.

[7] Mental Health Daily: At What Age is the Brain Fully Developed?, https://mentalhealthdaily.com/2015/02/18/at-what-age-is-the-brain-fully-developed/#:~:text=For%20some%20people%2C%20brain%20development%20may%20be%20complete,for%20when%20the%20brain%20has%20likely%20become%20mature (last accessed February 8, 2021); NPR: Brain Maturity Extends Well Beyond Teen Years, https://www.npr.org/templates/story/story.php?storyId=141164708 (last accessed February 8, 2021).

[8] Recidivism Among Federal Firearms Offenders, https://www.ussc.gov/research/research-reports/recidivism-among-federal-firearms-offenders.

Still, it's been a long time since Mr. Watford committed a felony. During his decades in prison, Mr. Watford has had no serious disciplinary infractions. Some of his less serious infractions can't be called entirely minor — e.g., possessing a dangerous weapon (2003, 2008, 2011) fighting with another person (2003, 2010, 2012), and bribing a staff member (2003). Still, the only offense of any sort he's had since 2012 was letting another inmate take his turn on the phone in July 2014, and there have been no offenses at all since then.

Mr. Watford has taken a basketful of educational and personal improvement courses—more than one might expect of an inmate who would be eighty-three when released from prison. He earned his GED. He has learned marketable skills such as cooking, commercial trucking, forklift operation, industrial sewing, building trades, and computer skills. He has taken personal development courses such as astronomy, business, ceramics, creative writing, finance, job search and interview skills, legal research, public speaking, parenting, real estate, and resume writing.

If released today, Mr. Watford would return to society with far more life and job skills than when he went into prison. As dangerous a man as he was when he was sentenced in 1998, he appears to pose a lower than average risk of crime today.

*5. Kinds of Sentences Available, 3553(a)(3)*

This wasn't a concern in 1998, when the sentencing guidelines were understood to be mandatory. The only kind of sentence available for Mr. Watford was a sentence between 802 and 867 months' imprisonment, and the court added a three-year supervised term. Authority to grant compassionate release would leave the court a binary choice: the court could either leave Mr. Watford in custody to serve the rest of his sentence, or could effectively commute the sentence to time served and start Mr. Watford on either his original three-year supervised release term or an extended supervised term.

*6. The Range Recommended by the Sentencing Guidelines, § 3553(a)(4)(A)*

The mandatory guidelines range was 802 to 867 months under 1998 sentencing law; the advisory guideline range is 290 to 317 months under the law as it's understood today.

*7. Need to Reflect the Seriousness of the Offenses, § 3553(a)(2)(A)*

This factor ordinarily overlaps and virtually duplicates that analysis of the nature and circumstances of the offense. This record presents no basis to distinguish those two factors. Mr. Watford's crimes are very serious, and demand a substantial sentence.

29

### 8. Need to Promote Respect for the Law, § 3553(a)(2)(A)

The public expects significant sentences for armed bank robbers, especially for those who committed three armed bank robberies, and especially those who committed three armed bank robberies after five previous and unrelated felony convictions. Mr. Watford received a significant sentence, consistent with the law as it existed and was understood at the time in 1998. A significant sentence under the law as it exists and is understood today would be considerably less than what Mr. Watford received in 1998.

Under neither 1998 law nor 2021 law could the public expect a death sentence for an offender such as Mr. Watford, and the law for which the sentence should promote respect for includes the First Step Act's provisions for compassionate release.

### 9. Need to Provide Just Punishment for the Offenses, § 3553(a)(2)(A)

This factor frequently overlaps and virtually duplicates that analysis of the nature and circumstances of the offense. This record provides no basis on which to distinguish the two factors. The offenses included no mitigation that would call for a different analysis.

### 10. The Need to Avoid Unwarranted Sentencing Disparities, § 3553(a)(6)

Two types of disparities are apparent. Ricky Anderson chose to plead guilty and testify against Mr. Watford, and he pleaded guilty before a superseding indictment added stackable § 924(c) counts to the second Sobieski Federal robbery and the attempted Elcose robbery. Mr. Anderson received an aggregate 200-month sentence—602 months less than what Mr. Watford received. Mr. Watford points to this as a disparity. It's a troubling difference: Mr. Anderson displayed a gun in all five robberies while Mr. Watford did so only in two, so Mr. Anderson appears to have been more culpable but received less than a quarter of what Mr. Watford got. But while troubling, it's not an unwarranted disparity. Mr. Anderson was convicted of three bank robbery charges but only one § 924(c) count, and he accepted responsibility for the crimes when he pleaded guilty. The sentencing guidelines, which were equally binding when Mr. Anderson was sentenced, produced the disparity between the Anderson and Watford sentences.

But this case presents another troubling disparity. This disparity, too, might not be strictly unwarranted, but is much closer to the concept. If a defendant identical in all respects to John Watford committed crimes identical in all respects to what Mr. Watford did twenty-four years ago and appeared in a federal court for sentencing today, and if the guideline range presented a reasonable sentence, his sentence would be 305 months, give or take a year. That hypothetical defendant would be released from prison before 2050—and John Watford would still have

years to serve. Mr. Watford could welcome that person into the prison and wish the person well as he left after completing his prison sentence. That disparity might not be "unwarranted" in the sense federal sentencing law uses the term—each sentence would have been properly calculated under then-prevailing law—but no other word in the English language better describes it.

Accounting for good time, Mr. Watford already has served the equivalent of a twenty-seven-year sentence, or 324 months.

### 11. The Need to Provide Restitution to Any Victims, § 3553(a)(7)

Mr. Watson and Mr. Anderson were both  ordered to make restitution to Sobieski Federal. The parties' submissions don't mention those obligations, so the court assumes restitution has been made.

### 12. Need to Provide Rehabilitative Treatment, § 3553(a)(2)(D)

Mr. Watford didn't appear to present a particular need for rehabilitative treatment in 1998, and the same statement seems appropriate today.

### D. The Exercise of Discretion, If There Were Any

Nearly all of the statutory sentencing factors lead to the conclusion that an 802-month sentence for Mr. Watford's crimes is excessive as we understand the

law in 2021. It would remain to consider whether the compassionate release motion should be granted.

Even with authority to grant Mr. Watford relief, the court couldn't revise his existing sentence to fit what might be reasonable under today's sentencing law. Granting a motion for compassionate release effectively converts a sentence to time served, with supervision to follow. A court ordinarily would hesitate because Mr. Watford hasn't served even half his sentence. Mr. Watford calculates that with good time credit, he has served the equivalent of a twenty-seven-year sentence so far, which translates to 324 months. The sentencing guidelines would recommend an aggregate sentence of 290 to 317 months, so Mr. Watford already has served longer than the guidelines would recommend. Given that, and given all the circumstances discussed in this opinion, the court would grant Mr. Watford's motion for compassionate release—if it had the authority to do so.

## V. CONCLUSION

John Watford committed two armed bank robberies and one attempted armed bank robbery with an accomplice in 1997. This court—this judge—sentenced him to 802 months for his crimes. Mr. Watford received an extra two decades in prison for the robbery in which he was armed, and an extra two and a half decades for the crimes in which he wasn't shown to have been armed. No guns were fired, even in the two uncharged robberies. Tellers suffer emotional

harm from the armed robbers, but no one was physically injured in the charged or uncharged robberies. Banks lost less than $10,000 in the three charged events. The sentence of sixty-six years and eight months was the low end of the binding guideline range, an example of the Draconian nature of the sentencing law of that age, and a manifestly unreasonable sentence by today's standards. If there were any legal authority to do so, this court—this judge—would order Mr. Watford released from prison. But a court's belief that a defendant's release would serve justice doesn't give the court the power needed to act. That power must come from the law. This opinion is meant to explain both why the court can't grant relief under 18 U.S.C. § 3582(c)(1)(A), and why it would grant relief if it could.

Mr. Watford exhausted his administrative remedies, but hasn't shown that an extraordinary and compelling reason justifies compassionate release. He must show both for the court to grant relief. Accordingly, the court DENIES his motion for compassionate release. [Doc. No. 304].

SO ORDERED.

ENTERED:   February 12, 2021

_____/s/ Robert L. Miller, Jr._____
Robert L. Miller, Jr., Judge
United States District Court